UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

In the Matter of the Application of

LEAFLY HOLDINGS, INC.;
STAGE ONE CANNABIS, LLC, d/b/a
STAGE ONE DISPENSARY; and
ROSANNA ST. JOHN,

                          Petitioners,

For a Judgment Pursuant to New York CPLR Article 78

                v.

NEW YORK STATE OFFICE OF CANNABIS
MANAGEMENT; CHRIS ALEXANDER, in his official capacity
as Executive Director of the New York State Office of Cannabis
Management; NEW YORK STATE CANNABIS CONTROL
BOARD; and TREMAINE S. WRIGHT, in her official capacity
as Chairwoman of the New York State Cannabis Control Board,

                          Respondents.

_____

**AMENDED
VERIFIED
PETITION**

Dkt. No.
1:23-cv-
01273-TJM-
DJS

          Petitioners Leafly Holdings, Inc. ("Leafly"); Stage One Cannabis, LLC,

d/b/a Stage One Dispensary ("Stage One"); and Rosanna St. John (together "Petitioners"),

by their attorneys, Phillips Lytle LLP, for their Verified Petition against Respondents New

York State Office of Cannabis Management ("OCM"); Christopher Alexander, in his

official capacity as Executive Director of OCM; the New York State Cannabis Control

Board ("Cannabis Control Board"); and Tremaine S. Wright, in her official capacity of

Chairwoman of the Cannabis Control Board (together "Respondents"), allege as follows:

## <u>NATURE OF THIS PROCEEDING</u>

1.      This CPLR Article 78 proceeding challenges OCM's promulgation and adoption of certain regulations concerning the marketing and retail sale of recreational cannabis for adult use.  These regulations, *inter alia*, are inconsistent with the New York Cannabis Law, irrational, unsupported by the facts, and arbitrary and capricious.  Even worse, these regulations violate Petitioners' rights guaranteed by the New York State Constitution.

2.      On December 14, 2022, OCM published its first draft of proposed regulations concerning adult-use recreational cannabis sales.  *See* 2022 NY REG TEXT 630960 (NS).  Contained within these regulations were provisions that would directly affect, and in some cases severely handicap, participants at all levels of the cannabis industry.

3.      Because of the concerning impact these regulations would have on the industry, on February 7, 2023, Leafly submitted an omnibus comment responding to the areas of greatest concern.  **Exhibit <u>A</u>** is a true and accurate copy of Leafly's initial comments dated February 7, 2023.

4.      Subsequently, on June 14, 2023, OCM published a revised version of its proposed rules.  *See* 2023 NY REG TEXT 630960 (NS).  Yet OCM's Assessment of Public Comment that accompanied this revision did not at all address any of the comments Leafly had previously offered in **Exhibit <u>A</u>**.

5.      Alarmed that OCM's revised rules did not reflect any meaningful changes that would be responsive to its concerns, Leafly responded by submitting an

additional omnibus comment.  **Exhibit <u>B</u>** is a true and accurate copy of Leafly's supplemental comments, dated July 28, 2023.

6.      Leafly notified OCM that its proposed regulations would essentially bar its business operations in New York, leaving the many consumers who rely on its services without the information necessary to make informed purchase decisions.  Ex. B.

7.      As of the date of this Petition, OCM has not published an "Assessment of Public Comment" for the comments submitted regarding the revised proposed regulations.  As a result, OCM has not publicly addressed any of the concerns presented in Leafly's supplemental comments.

8.      On September 12, 2023, OCM adopted Parts 118 through 121, 123 through 125, and 131 of Chapter II of Subtitle B of Title 9 of the Official Compilation of Codes, Rules and Regulations of the State of New York.  That Chapter governs adult-use cannabis, medical cannabis, and cannabinoid hemp.

9.      The adopted regulations, which were unchanged from the June 14, 2023 version previously circulated for public comment, negatively impact consumers, retailers, and third-party service providers alike.  As a result, members of each of these groups have come together to petition this Court to issue a judgment permanently staying and enjoining the State from enforcing several of these regulations.

<u>PARTIES, JURISDICTION, AND VENUE</u>

10.      Leafly is a Delaware corporation that provides a platform for consumers to research and make informed purchasing decisions regarding cannabis.  Leafly maintains its principal place of business in Seattle, Washington.

- 3 -

11.     Stage One is a New York limited liability company that owns and operates a licensed cannabis dispensary.  Stage One maintains its principal place of business at 810 Broadway, Unit C, in the City of Rensselaer in Rensselaer County, New York.

12.     Rosanna St. John is a consumer of cannabis products who utilizes Leafly to make informed purchase decisions.  She is a resident of the City of Tonawanda in Erie County, New York.

13.     OCM is tasked with implementing a regulatory framework for medical and adult-use cannabis and hemp in the State of New York pursuant to the Cannabis Law.  Upon information and belief, OCM maintains its principal place of business in the W. Averell Harriman State Office Building Campus, Building 9, in the City and County of Albany, New York.

14.     Christopher Alexander is the Executive Director of OCM and, upon information and belief, maintains his office in the W. Averell Harriman State Office Building, Building 9, in the City and County of Albany, New York.

15.     The Cannabis Control Board is the oversight body of the Office of Cannabis Management.  The Board is responsible for approving the comprehensive regulatory framework for New York's cannabis industry.  Upon information and belief, the Cannabis Control Board maintains its principal place of business in the W. Averell Harriman State Office Building, Building 9, in the City and County of Albany, New York.

16.     Tremaine S. Wright is the Chairwoman of the Cannabis Control Board and, upon information and belief, maintains her office in the W. Averell Harriman State Office Building, Building 9, in the City and County of Albany, New York.

- 4 -

17.     Respondents maintain their principal places of business in the State of New York; regularly transact or solicit business within the State of New York; and/or derive substantial revenues from services rendered in the State of New York.

18.     This Court has jurisdiction over this proceeding pursuant to CPLR 301 and 7803(3).

19.     Pursuant to CPLR 503 and 506(b), venue is proper in Albany County, where the Cannabis Control Board adopted the regulations challenged herein on September 12, 2023, and where the material events at issue in this proceeding took place.

## FACTUAL BACKGROUND

**A.     A Brief History of OCM's Disastrous Rollout of Cannabis Regulations**

20.     **Exhibit C** is a collection of true and accurate copies of news articles and governmental reports relevant to the legalization of cannabis in New York.

21.     On March 31, 2021, Governor Andrew Cuomo signed the Marihuana Regulation and Taxation Act ("MRTA") into law, legalizing recreational cannabis use for adults over the age of twenty-one and establishing OCM as the principal regulatory agency for cannabis in New York.  Ex. C at 2.[1]

22.     Immediately, a supply and demand gap formed, with New York residents now lawfully permitted to consume recreational cannabis products, but no in-state businesses yet permitted to make sales.

---

[1] Will Yakowicz, *New York State Legalizes Adult-Use Cannabis*, FORBES (March 31, 2021 at 11:19 AM), https://www.forbes.com/sites/willyakowicz/2021/03/31/new-york-state-legalizes-adult-use-cannabis/?sh=630a44c7395c.

23.     By February 8, 2022, reports surfaced that dozens of violators were already transacting in cannabis, in clear violation of the MRTA, which requires dispensary licensure.  At that time, the Cannabis Control Board — which had conducted its first meeting on October 5, 2021 — belatedly acted by sending out cease-and-desist letters.  Ex. C at 10.[2]

24.     On March 9, 2022, OCM Executive Director Chris Alexander, attempting to justify OCM's deliberately slow rollout of dispensary licensure to the New York Times, admitted, "I could press the green button right now and have 40 dispensaries online."  Ex. C at 15.[3]

25.     Eventually, OCM launched the Conditional Adult-Use Retail Dispensaries ("CAURD") licensing program.  Ex. C at 23.[4]

26.     The CAURD program, part of OCM's March 10, 2022 "Seeding Opportunity Initiative," prioritizes adult-use retailer licenses for individuals with prior cannabis-related offenses.  Ex. C at 29.[5]

---

[2] Press Release, *Office of Cannabis Management Announces Enforcement Action*, OFFICE OF CANNABIS MANAGEMENT (February 8, 2022), https://cannabis.ny.gov/news/office-cannabis-management-announces-enforcement-action.

[3] *First New York Licenses Will Go To Entrepreneurs With Prior Convictions*, SHANKEN NEWS DAILY (March 15, 2022), https://www.shankennewsdaily.com/2022/03/15/30615/first-new-york-licenses-will-go-to-entrepreneurs-with-prior-convictions/.

[4] John Schroyer, *Has New York Reached a Breaking Point?*, GREEN MARKET REPORT (Sept. 6, 2023), https://www.greenmarketreport.com/has-new-york-reached-a-breaking-point/.

[5] Press Release, *Governor Hochul Announces The Office of Cannabis Management Seeding Opportunity Initiative*, GOVERNOR'S PRESS OFFICE (March 10, 2022), https://www.governor.ny.gov/news/governor-hochul-announces-office-cannabis-management-seeding-opportunity-initiative

27.    At the same time it was struggling with combatting illegal sales, OCM — being responsible for public education and outreach concerning responsible cannabis usage — attempted to implement its "Cannabis Conversations" advertisement campaign. Ex. C at 36.[6]

28.    On May 23, 2022, for example, OCM pleaded with social media platform and advertisement host Tik-Tok — which had rejected OCM's proposed advertisement campaign — to allow OCM to broadcast its messages on the platform.  Ex. C at 59.[7]  Exhorting Tik-Tok, Director Alexander wrote, "We ask you to join us in the effort to make sure the end of cannabis prohibition in New York is safe for residents of all ages. Clear and truthful public health information is essential in our public information campaigns ....  But that can only be the case if you allow us to run advertisements on your platform."  *Id.* at 60.

29.    By July 7, 2022, the effects of OCM's slow rollout were undeniable, with a massive proliferation of illicit dispensaries.  Again, OCM resorted to sending out cease-and-desist letters.  Ex. C at 61.[8]

---

[6] OFFICE OF CANNABIS MANAGEMENT, CANNABIS CONVERSATIONS REPORT, https://cannabis.ny.gov/system/files/documents/2023/08/ocm-cannabis-conversations-final-report.pdf.

[7] Chris Alexander, *Letter to Tik-Tok*, OFFICE OF CANNABIS MANAGEMENT (May 23, 2022), https://cannabis.ny.gov/system/files/documents/2022/05/letter-from-new-yorks-office-of-cannabis-management-to-tiktok-5.23.22.pdf.

[8] Press Release, *Office of Cannabis Management Publicly Identifies Illicit Retail Operations*, OFFICE OF CANNABIS MANAGEMENT (July 2022), https://cannabis.ny.gov/system/files/documents/2022/07/office-of-cannabis-management-publicly-identifies-illicit-retail-operations.pdf.

30.     The next month, OCM approved final rules, codified at Part 116 in Chapter II of Subtitle B of Title 9 of the Official Compilation of Codes, Rules and Regulations of the State of New York, establishing the CAURD licensing program and implementing the "Seeding Opportunity Initiative."  The application period for retailers seeking CAURD licenses was open until September 26, 2022.

31.     Immediately after the application period closed, an out-of-State business that is majority-owned by a Michigan resident previously convicted of a marijuana-related offense filed suit in the United States District Court for the Northern District of New York, alleging that OCM's management of the CAURD program violated the Dormant Commerce Clause of the United States Constitution.  Thereafter, this business, Variscite, moved for a preliminary injunction.  **Exhibits D** and **E** are true and accurate copies of the complaint and motion for preliminary injunction, respectively, filed in *Variscite NY One v. New York*, 1:22-cv-1013 (N.D.N.Y. September 26, 2022).[9]

32.     On October 28, 2022, OCM published a 28-page document entitled "Guidance for Adult Use Retail Dispensaries" (*available at* https://cannabis.ny.gov/ system/files/documents/2023/02/guidance-for-adult-use-retail-dispensaries-2.1.pdf), which claimed it was "binding on an Applicant" for a retail dispensary license, "and [anyone] that receives an adult-use retail dispensary license."  Although unchallenged, this purported "Guidance" amounted to a set of rules never adopted in accordance with the State

---

[9] *See* Complaint, *Variscite NY One v. New York*, 1:22-cv-1013 (N.D.N.Y. September 26, 2022) (Dkt. 1); Motion for Preliminary Injunction, *Variscite NY One v. New York*, 1:22-cv-1013 (N.D.N.Y. October 4, 2022) (Dkt. 6).

Administrative Procedure Act ("SAPA").  This was the first of many times OCM would flaunt its obligation to promulgate regulations in accordance with the MRTA.

33.     On November 10, 2022, the District Court determined in *Variscite* that the CAURD program likely violated the dormant commerce clause, and enjoined OCM from issuing CAURD licenses in a limited number of geographic areas.  **Exhibit F** is a true and accurate copy of the Court's Order dated November 10, 2022, in *Variscite NY One v. New York*, 1:22-cv-1013 (N.D.N.Y. Sept. 26, 2022), granting Variscite's motion for preliminary injunction.[10]

34.     Notwithstanding the District Court's injunction, on November 21, 2022, OCM awarded the first batch of licenses to CAURD applicants.  Ex. C at 64.[11]

35.     To encourage and promote an equitable industry, OCM had promised CAURD applicants financial and operational support through a multi-million dollar fund operated by the Dormitory Authority of the State of New York ("DASNY").  Despite this, DASNY, and by extension OCM, largely failed to cautiously select and oversee the operations of the fund eventually chosen, and its financial data have remained opaque ever since.  Ex. C at 82.[12]

---

[10] *See* Memorandum Decision and Order, *Variscite NY One v. New York*, 1:22-cv-1013, 2022 WL 17257900, at *19 (N.D.N.Y. Nov. 10, 2022) (granting Variscite's motion for preliminary injunction).

[11] Brad Racino, *NY marijuana regulators adopt proposed rules for the state's marketplace, grant first retail licenses*, SYRACUSE.COM (Nov. 20, 2022 at 11:52 AM), https://www.syracuse.com/marijuana/2022/11/ny-marijuana-regulators-publish-proposed-rules-for-the-states-marketplace-ahead-of-tomorrows-meeting.html.

[12] *See, e.g.*, Brad Racino and Sean Teehan, *Smoke and mirrors:  Inside the murky $200M effort to kickstart NY's marijuana industry*, SYRACUSE.COM (December 1, 2022), https://www.syracuse.com/marijuana/2022/12/smoke-and-mirrors-inside-the-murky-200m-effort-to-kickstart-nys-marijuana-industry.html.

36.     In January 2023, OCM reported its receipt of over 400 complaints regarding unlicensed businesses in the prior year.  *Id.* at 106.[13]

37.     OCM announced an increase in the number of CAURD licenses from 150 to 300 on March 2, 2023.  Ex. C at 174.[14]

38.     On March 16, 2023, a group of dispensaries challenged the CAURD regulations and OCM's actions on independent statutory and procedural grounds (the "Coalition Suit").  **Exhibit G** is a true and accurate copy of the Verified Petition filed in *Coalition for Access to Regulated & Safe Cannabis v. New York State Cannabis Control Bd.*, Index No. 902390-23 (Sup. Ct. Albany County).[15]  The plaintiffs in the Coalition Suit did not seek injunctive relief, and the case remains active as of the date of this Petition.

39.     On May 31, 2023, OCM settled the *Variscite* case, and agreed to award Variscite a general (not CAURD) adult-use retail dispensary license in the first group of such licenses to be awarded.  **Exhibit H** is a true and accurate copy of the Settlement Agreement and Stipulation of Dismissal dated May 25, 2023, in *Variscite NY One v. New York*, 1:22-cv-1013 (N.D.N.Y. May 31, 2023).

---

[13] OFFICE OF CANNABIS MANAGEMENT, INAUGURAL ANNUAL REPORT, https://cannabis.ny.gov/system/files/documents/2023/01/ocm-annual-report-2022.pdf.

[14] NBC New York Staff and The Associated Press, *NY Doubling Number of Recreational Pot Sellers Statewide*, NBC NEW YORK (March 2, 2023), https://www.nbcnewyork.com/news/local/ny-set-to-double-number-of-licenses-for-cannabis-dispensaries-across-state/4132004/.

[15] Verified Petition, *Coal. for Access to Regulated & Safe Cannabis v. New York State Cannabis Control Bd.*, Index No. 902390-23 (Sup. Ct. Albany County).

40.     Subsequently, in June 2023, a member of the Cannabis Control Board resigned in an unexplained exit amid mounting criticism of OCM mismanagement and conflicts of interest regarding DASNY among board members.  Ex. C at 180.[16]

41.     On August 2, 2023, a group of, *inter alia*, disabled veterans, brought a lawsuit in New York State Supreme Court, Albany County, seeking a declaratory judgment that OCM's CAURD licensing program was *ultra vires* and unconstitutional, and an injunction prohibiting OCM from awarding or processing additional CAURD licenses. **Exhibit I** is a true and accurate copy of the Complaint filed in *Fiore v. New York State Cannabis Control Board, et al.*, Index No. 907282-23 (Sup. Ct. Albany County).[17]  This Court entered a temporary restraining order in *Fiore* later the same week.

42.     The *Fiore* suit has resulted in multiple injunctions, and this Court has enjoined OCM from issuing new CAURD licenses.  Indeed, Justice Kevin Bryant expressly criticized OCM leadership's continued actions in view of the lawsuits:  "Despite the fact that the dormant commerce clause claims remained unresolved by the stipulation entered in federal court, and the pendency of the Coalition [Suit] before this Court, OCM made the decision to immediately and dramatically expand the CAURD program ...."  **Exhibit J** is a

---

[16] *See* MJBizDaily Staff, *Key figure in flawed New York adult-use marijuana rollout quits regulatory board*, MJBizDaily (June 15, 2023), https://mjbizdaily.com/reuben-mcdaniel-resigns-from-new-york-cannabis-control-board/.

[17] *See* Complaint p. 4, *Carmine Fiore v. New York State Cannabis Control Board, et al.*, Index No. 907282-23 (Sup. Ct. Albany County) (Doc. No. 2).

true and accurate copy of this Court's Order, filed August 18, 2023, in *Fiore*.[18]  After later

receiving additional briefing on the issue, Judge Bryant expanded his injunction.  **Exhibit** **K**

is a true and accurate copy of this Court's Order, filed August 30, 2023, in *Fiore*.[19]

43.     OCM's rollout of legalized cannabis in New York has been rocky, to

put it charitably.  Its regulatory decisions have been repeatedly and successfully challenged

in court and its enforcement failures have allowed illicit dispensaries to fill the gap and

supply product of unknown quality and safety to New York's consumers.  Altogether,

OCM's failures have meant only twenty-three adult-use dispensaries are currently in

operation as of the filing of this Petition.  Ex. C at 184.[20]

44.     In late August 2023, a mental health survey of New York cannabis

industry participants revealed the psychological toll being caused by OCM's missteps.

Many survey respondents said a causal reason for their stress was that "they invested time

and resources into an industry they were told would be up and running by now, and feel

duped."  Ex. C at 196.[21]

---

[18] *See* Decision and Order p. 6, *Carmine Fiore v. New York State Cannabis Control Board, et al.*, Index No. 907282-23 (Sup. Ct. Albany County) (Doc. No. 152).

[19] *See* Decision and Order, *Carmine Fiore v. New York State Cannabis Control Board, et al.*, Index No. 907282-23 (Sup. Ct. Albany County) (Doc. No. 298).

[20] Jonathan Roeder and Laura Nahmias, *New York's Legal Cannabis Market Inches Forward With Wave of New Licenses*, BLOOMBERG (July 24, 2023 at 7:00 AM), https://www.bloomberg.com/news/newsletters/2023-07-24/new-york-s-legal-pot-market-shows-signs-of-progress#xj4y7vzkg.

[21] NY Cannabis Insider Staff, *Survey: New York cannabis entrepreneurs see decline in mental health*, SYRACUSE.COM (Aug. 23, 2023 at 7:45 AM), https://www.syracuse.com/marijuana/2023/08/survey-new-york-cannabis-entrepreneurs-see-decline-in-mental-health.html.

45.     The faulty rollout has had dramatic consequences for retailers, consumers, growers, ancillary-service providers (Ex. C at 208),[22] and the State itself.  *Id.*[23] As the <u>New York Post</u> reports, "Meanwhile, OCM's slow start in licensing anyone at all has led to just 23 licensed dispensaries open across the whole Empire State.  Instead, a brazen black and gray market of unlicensed weed shops has sprouted in the city, while tainted pot products are for sale at corner bodegas and smoke shops ....  Meanwhile, New York's marijuana farmers are stuck with 300,000 pounds of spoiling product that they can't sell to legal dispensaries that don't exist.  (The black-market shops have their own sources of supply, which again don't comply with OCM [regulations]) ....  New York is losing millions in taxes due to lackluster legal marijuana sales, driven by the shortage of licensed dispensaries."  *Id.* at 234.[24]

46.     Indeed, this failed process over the course of two years has led lawmakers to announce oversight hearings.  Ex. C at 236.[25]

---

[22] Sean Teehan, *Slow rollout of legal cannabis in New York leaves ancillary service providers struggling to survive*, CANNABIS INSIDER (May 4, 2023 at 9:01 AM), https://www.newyorkupstate.com/marijuana/2023/05/slow-rollout-of-legal-cannabis-in-new-york-leaves-ancillary-service-providers-struggling-to-survive.html.

[23] Henry Rosoff, *Civil rights leaders call out NY for slow rollout of recreational marijuana*, PIX11 (June 28, 2023 at 7:26 PM), https://pix11.com/news/local-news/civil-rights-leaders-call-out-ny-for-slow-rollout-of-recreational-marijuana/.

[24] Post Editorial Board, *New York's legal-weed rollout looks ever more dope-y*, NEW YORK POST (Sep. 6, 2023, 7:26 PM), https://nypost.com/2023/09/06/new-york-is-fumbling-legal-weed-rollout-with-licensing-delays/.

[25] Sean Teehan, *Senator calls for first-ever hearing over NY cannabis rollout*, OLEAN TIMES HERALD (Sep 7, 2023), https://www.oleantimesherald.com/news/senator-calls-for-first-ever-hearing-over-ny-cannabis-rollout/article_cb71cd08-4db4-11ee-9ba1-87815224e153.html.

**B.    OCM's Regulations Concerning Adult-Use Cannabis**

47.    Now, OCM has promulgated unconstitutional and arbitrary regulations that will irreparably harm Leafly and similarly situated ancillary service providers, as well as licensed dispensaries and cannabis consumers.

48.    On December 14, 2022, OCM published proposed rules for adult-use cannabis.  *See* 2022 NY REG TEXT 630960 (NS).

49.    On February 7, 2023, Leafly submitted an omnibus comment responding to the areas of greatest concern with the proposed regulations.  Ex. A.

50.    On June 14, 2023, OCM published a revised version of the proposed rules for adult-use retailers.  *See* 2023 NY REG TEXT 630960 (NS).

51.    On July 28, 2023, Leafly — partially out of concern that the revised rules did not reflect meaningful changes responsive to some of the concerns outlined in its initial comment — submitted an additional omnibus comment.  Ex. B.

52.    As of the date of this Petition, OCM has not published an "Assessment of Public Comment."  Further, OCM has not publicly addressed any of the concerns posed by Leafly and others regarding the proposed regulations.  But in a recent telephone call with Leafly, Axel Bernabe, Esq., then Chief of Staff and Senior Policy Director for OCM, attempted to justify the regulations by saying, "We don't want consumers comparing prices.  We want them to go to their neighborhood store to make purchases."

53.    OCM's view on the matter can also be extrapolated from its comments concerning 9 N.Y.C.R.R., Parts 128 and 129, which were published in the State Register

last year.  **Exhibit L** is a true and accurate copy of Parts 128 and 129, Packaging, Labeling,

Marketing and Advertising Proposed Regulations:  Assessment of Public Comment.

54. On September 12, 2023, OCM adopted 9 N.Y.C.R.R., Parts 118

through 121, 123 through 125, and 131 concerning Adult-Use Cannabis.

55. The following are the pertinent regulation sections that Petitioners

challenge in this proceeding:

a. 9 N.Y.C.R.R. § 123.10(g)(21), which prohibits retail dispensaries from "pay[ing] for marketing or promotion through a third-party platform, marketplace, or aggregator that lists cannabis products for sale;"

b. 9 N.Y.C.R.R. § 124.5(a) (collectively, with § 123.10(g)(21), the "Third-Party Marketing Ban"), which prohibits licensees from contracting with a "person or entity performing any function or activity directly involving the licensed activities authorized for the license type'"

c. 9 N.Y.C.R.R. § 123.10(g)(23) (the "Third-Party Order Ban"), which prohibits retailers from "fulfill[ing] any order placed or otherwise acquired from the retail dispensary's purported website on a third-party marketplace or aggregator where other retail dispensary licensees are listed, or visa-versa" [sic];

d. 9 N.Y.C.R.R. § 124.1(b)(2) (the "Third-Party All-Licensee Listing Mandate"), which prohibits retailers from entering into any contract with third-party platforms that do not "list all licensees authorized for the retail sale of such cannabis products" when "advertising or listing a cannabis product;"

e. 9 N.Y.C.R.R. § 124.1(b)(5)(ii) (the "Pricing Ban"), which prohibits retailers from entering into any contract with third-party platforms that do not redirect to the domain of a licensee authorized for retail sale of cannabis "before the price of adult-use cannabis products are displayed" [sic]; and

f. 9 N.Y.C.R.R. § 124.1(c)(1)-(2) (the "Third-Party Distributor Listing Mandate"), which prohibits retail dispensaries from listing their cannabis products on any third-party platform that does not "allow for any licensed distributor, who is willing and in good standing, to be listed as an option for logistics and transportation purposes" and "allow customers to negotiate fees for such services directly with such distributors."

**Exhibit** **M** consists of a true and accurate copy of those regulations, referenced collectively herein as the "Challenged Regulations."

56. On September 12, 2023, the Cannabis Control Board adopted, *inter alia*, the Challenged Regulations.

57. As per OCM, the Challenged Regulations are scheduled to take effect on September 27, 2023.

**C.** **Leafly's Background and Business Model**

58. For over a decade, Leafly has provided a platform for consumers to research and make informed purchasing decisions regarding cannabis. Leafly connects thousands of retailers and brands with millions of consumers looking for safe and legal cannabis in their neighborhoods.

59.     Leafly's extensive library of articles and educational resources has provided over 100 million consumers with information regarding cannabis.  Leafly's database contains over 11,000 cannabis articles and educational resources.

60.     Leafly operates similarly to other third-party aggregators such as OpenTable.[26]  Specifically, Leafly provides a centralized location where consumers can obtain information (*e.g.*, available cannabis products, prices, dispensary business hours, etc.) and connect with businesses in the cannabis industry.  Essentially, Leafly functions as an intermediary connecting customers with retail dispensaries.

61.     Consumers are currently unable to make purchases through Leafly's website.  Rather, they can use Leafly to inform retail dispensaries of their desired products and make arrangements to complete the transaction directly with the retailer.  As a result, the primary service Leafly provides to consumers is a platform to find centralized information regarding licensed retailers in their neighborhoods, and the products they offer.

62.     Retail dispensaries enter into agreements with Leafly to be included on its website.  In addition to the initial costs of being included on the site, retailers can purchase additional advertising.  Specifically, retailers can purchase advertisements on the homepage or pay to have their advertisement appear above the search results.

---

[26] OpenTable is a restaurant reservation booking website.  It does not process payments.  Instead, it merely provides potential consumers with information concerning the restaurants in a particular geographic area.  In the event a consumer wishes to dine at a restaurant, OpenTable provides the consumer with the means of contacting the restaurant and reserving a table.  Leafly functions in a similar way.

63.     This business model is nothing new.  Indeed, it is how every major website that provides free public access to information makes a profit.

64.     For example, Google's website explains that, "[w]hen people search on Google for something they want, they find two types of results:  search results and ads." Indeed, Google explains that ads and search results are displayed on its webpage as follows:



*1 = Ads , 2 = Search results

**Exhibit N** is a true and accurate copy of a Google support page explaining how Google search results differ from ads.[27]

65.     Leafly operates in a similar manner allowing retailers to purchase advertising or prioritization on its website.  The revenue generated from this advertising allows Leafly to continue operating and providing consumers with invaluable information concerning the purchase of cannabis.

66.     As is true on almost every similar website, the costs of providing free information are offset by one of two primary means:  (1) the sale of advertisements, or (2)

---

[27] https://support.google.com/google-ads/answer/1722080?hl=en#:~:text=When%20people%20search%20on%20Google,around%20the%20free%20search%20results.

the sale of users' personal data.  Leafly has chosen to sell advertisements.  This revenue

model and method of advertising is hardly abnormal; rather, it is the industry standard.

**D.   Harm Caused to the Petitioners**

67.   New York Cannabis Law § 2 makes clear that its purpose is, in part, to

"create new industries, ... increase employment and ... reduce participation of otherwise

law-abiding citizens in the illicit market ...."  Leafly's services undoubtedly contribute to

accomplishing these goals.  Indeed, Leafly's extensive library of resources and digital town

square allow consumers to do their research and make informed decisions regarding the

purchase of cannabis from a licensed retailer.

68.   Trusting that OCM was committed to achieving the purposes laid out

in the Cannabis Law, Leafly committed significant resources to expand its business into

New York's budding cannabis market.

69.   Leafly invested over $300,000.00 in funds and 500 hours of time to

connect, strengthen, and grow New York's cannabis industry.  Indeed, Leafly has partnered

with licensed retail dispensaries across New York, and has provided information concerning

legal cannabis products to millions of potential consumers.

70.   Since making this investment, licensed retailers such as Stage One

have come to rely on Leafly to provide a platform to connect with, and advertise to,

consumers.  Indeed, Stage One has made clear that it relies on Leafly as "a primary tool for

advertising."  *See* Affidavit of Galina German Innes, sworn to on September 14, 2023, at ¶

60.

71.     Similarly, cannabis consumers have come to rely on Leafly as a source of information.  Specifically, Rosanna St. John, a resident of the City of Tonawanda, New York, has stated that she has a personal profile on Leafly that allows her to make informed purchase decisions.  *See* Affidavit of Rosanna St. John, sworn to on September 14, 2023, at ¶ 10.

72.     The Third-Party Marketing Ban in 9 N.Y.C.R.R. § 123.10(g)(21), however, prevents licensed retail dispensaries from paying for any kind of "promotion" on a third-party website at all.  By regulating in this obtrusive manner, OCM is depriving retailers of one of the few effective advertising outlets left available to them by the MRTA.  As a result, retailers will be required to manage their own independent webpage and online ecosystem in addition to their brick-and-mortar store.  This requirement conflicts with the MRTA's goal of "creat[ing] new [legal] industries . . . [and] increas[ing] employment." Cannabis Law § 2.

73.     Both the Third-Party Marketing Ban and the Pricing Ban in 9 N.Y.C.R.R. § 124.1(b)(5)(ii) also harm consumers by making it more difficult for them to obtain information about legal dispensaries and make informed purchasing decisions. Indeed, established and reputable third-party aggregators and advertisement platforms (such as Leafly) are partnering with legal dispensaries in the fight against illicit dispensaries and the often untested and un-reviewed products they sell to unsuspecting consumers.  By restricting paid advertising, OCM has made New York's domestic market murkier and less navigable, and has limited the information available to consumers to aid in making cannabis purchase decisions.

74.    If Leafly were to continue operating in New York under the Third-Party Marketing Ban and the Pricing Ban, it would need to alter its services fundamentally by removing all pricing information from dispensary profiles (which would make Leafly less attractive to consumers as a source of information).  Dispensaries would similarly be unable to advertise their products on Leafly's website, thereby resulting in lost business opportunities for those dispensaries and Leafly.

75.    Indeed, if the Challenged Regulations are enforced, Leafly would be required to fundamentally change its entire business — if that is even possible given those Regulations' expansive restrictions — or cease operations in New York altogether.

76.    Further, the Challenged Regulations also require Leafly to secure the participation of every licensed dispensary in the state — something that is nearly impossible.

77.    At its core, Leafly strongly believes that cannabis can be a force for positive change in our world.  For this reason, Leafly believes the cannabis industry, and the organizations regulating it, have a responsibility to educate and connect consumers with *legal* cannabis retailers.  OCM's regulations make this goal, which is at the core of New York's Cannabis Law, much more difficult to achieve.

78.    A petitioner likely to succeed on the merits of an Article 78 proceeding must demonstrate "the prospect of irreparable injury if . . . provisional relief is withheld." *Doe v. Axelrod*, 73 N.Y.2d 748, 750 (1988).

79.    OCM's violation of Petitioners' constitutional rights constitutes irreparable harm to them *per se*.  "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary" to

justify provisional stay relief. *Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir. 1996). Here, the Third-Party Marketing Ban and the Pricing Ban violate Article I, § 8, of the New York Constitution.

80.    "The 'balancing of the equities' ... requires the court to look to the relative prejudice to each party accruing from a grant or a denial of" a preliminary injunction. *Ma v. Lien*, 198 A.D.2d 186, 187 (1st Dep't 1993).

81.    Enforcement of OCM's regulations would irreparably harm all businesses involved in the Cannabis industry.

## **FIRST CAUSE OF ACTION**
### **(CPLR Article 78 - Annulment of the Third-Party Marketing Ban and the Pricing Ban for Violation of Article I, § 8, of the New York Constitution)**

82.    Petitioners repeat and reallege the allegations contained in paragraphs 1 through 81 with the same force and effect as if fully set forth here.

83.    An action by the Cannabis Control Board, such as its promulgation of illegal regulations that would govern the cannabis industry, "shall be subject to review by the supreme court in the manner provided in article seventy-eight of the civil practice law and rules[.]" Cannabis Law § 135.

84.    CPLR 7803(3) authorizes annulment of a New York State agency regulation that is "made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion …."

85.    Pursuant to Article I, Section 8, of the New York Constitution, "Every citizen may freely speak, write and publish his or her sentiments on all subjects, being

responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."

86.     The Third-Party Marketing Ban, 9 N.Y.C.R.R. §§ 123.10(g)(21) and 124.5(a), and the Pricing Ban, 9 N.Y.C.R.R. § 124.1(b)(5)(ii), prohibit Petitioners from engaging in lawful, non-misleading commercial speech by banning paid marketing and accurate pricing information, respectively.

87.     Neither the Third-Party Marketing Ban nor the Pricing Ban advances a substantial government interest.  Rather, the Third-Party Marketing Ban and the Pricing Ban are more extensive than necessary to serve any substantial government interest.

88.     Accordingly, the Third-Party Marketing Ban and the Pricing Ban are in violation of lawful procedure, are affected by an error of law, are arbitrary and capricious, and are an abuse of discretion because they violate Article I, § 8, of the New York Constitution.

89.     As described *supra*, Petitioners will suffer irreparable harm if the Third-Party Marketing Ban and the Pricing Ban take effect and are enforced.

90.     The harm that Petitioners would suffer absent a stay is greater than any harm imposed if a stay were granted.

91.     Petitioners are entitled to a judgment permanently staying and enjoining Respondents from enforcing the Third-Party Marketing Ban, 9 N.Y.C.R.R. §§ 123.10(g)(21) and 124.5(a), and the Pricing Ban, 9 N.Y.C.R.R. § 124.1(b)(5)(ii); and annulling said Third-Party Marketing Ban and the Pricing Ban, because they violate Article I, § 8, of the New York Constitution.

**SECOND CAUSE OF ACTION**
**(CPLR Article 78 - Annulment of the Challenged Regulations as Arbitrary and Capricious)**

92.     Petitioners repeat and reallege the allegations contained in paragraphs 1 through 91 with the same force and effect as if fully set forth here.

93.     CPLR 7803(3) authorizes annulment of an agency determination that was "arbitrary and capricious[.]"

94.      "'An administrative agency acts arbitrarily and capriciously when it takes action "without sound basis in reason and [when such action] is generally taken without regard to the facts." *Matter of Pell v. Bd. of Educ. of Union Free Sch. Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County*, 34 N.Y.2d 222, 231 (1974).

95.     For the reasons set forth *supra*, the Third-Party Marketing Ban, 9 N.Y.C.R.R. §§ 123.10(g)(21) and 124.5(a); the Pricing Ban, 9 N.Y.C.R.R. § 124.1(b)(5)(ii); the Third-Party Order Ban, 9 N.Y.C.R.R. § 123.10(g)(23); the Third-Party All-Licensee Listing Mandate, 9 N.Y.C.R.R. § 124.1(b)(2); and the Third-Party Distributor Listing Mandate, 9 N.Y.C.R.R. § 124.1(c)(1)-(2), are arbitrary and capricious.

96.     As described *supra*, Petitioners will suffer irreparable harm (*i.e.*, loss of goodwill and business opportunities) if enforcement of these regulations is not stayed.

97.     The harm that Petitioners would suffer absent a stay greatly exceeds any harm imposed if a stay were granted.

98.     Petitioners are entitled to a judgment permanently staying and enjoining Respondents from enforcing the Third-Party Marketing Ban, 9 N.Y.C.R.R. §§ 123.10(g)(21) and 124.5(a); the Pricing Ban, 9 N.Y.C.R.R. § 124.1(b)(5)(ii); the Third-Party

Order Ban, § 123.10(g)(23); the Third-Party All-Licensee Listing Mandate, § 124.1(b)(2); and the Third-Party Distributor Listing Mandate, § 124.1(c)(1)-(2); and annulling said Challenged Regulations because they are arbitrary and capricious.

**THIRD CAUSE OF ACTION**
**(CPLR Article 78 - Annulment of the Challenged Regulations for Inconsistency with the MRTA)**

99.     Petitioners repeat and reallege the allegations contained in paragraphs 1 through 98 with the same force and effect as if fully set forth here.

100.     Agency regulation must be consistent with the authority conferred by the statute, the statutory language itself, and the legislation's underlying purpose.  *See Seittelman v. Sabol*, 91 N.Y.2d 618, 626-27 (1998); *Matter of N.Y. City Pedicab Owners' Ass'n, Inc. v. N.Y. City Dep't of Consumer Affairs*, 61 A.D.3d 558, 559 (1st Dep't 2009) ("Administrative agencies can only promulgate rules to further the implementation of the law as it exists; they have no authority to create a rule out of harmony with the statute").

101.     The Third-Party Marketing Ban, 9 N.Y.C.R.R. §§ 123.10(g)(21) and 124.5(a); the Pricing Ban, 9 N.Y.C.R.R. § 124.1(b)(5)(ii); the Third-Party Order Ban, 9 N.Y.C.R.R. § 123.10(g)(23); the Third-Party All-Licensee Listing Mandate, 9 N.Y.C.R.R. § 124.1(b)(2); and the Third-Party Distributor Listing Mandate, 9 N.Y.C.R.R. § 124.1(c)(1)-(2), are inconsistent with the goals of the MRTA and lack an appropriate legislative mandate.

102.     The Cannabis Law states its purpose is, *inter alia*, to "create new industries, … increase employment and strengthen New York's agriculture sector," and

"reduce participation of otherwise law-abiding citizens in the illicit market ...."  Cannabis Law § 2.

103.    Further, Cannabis Law § 64 provides that "[t]he state cannabis advisory board shall have the authority to recommend to the board the number of licenses issued pursuant to this article to ensure a competitive market where no licensee is dominant in the statewide marketplace or in any individual category of licensing ...."

104.    Here, the restrictions imposed by the Challenged Regulations are inconsistent with the stated goals of the MRTA, which confers regulatory authority upon OCM and the Cannabis Control Board.

105.    As described *supra*, Petitioners will suffer irreparable harm (*i.e.*, loss of goodwill and business opportunities) if enforcement of the Challenged Regulations is not stayed.

106.    The harm that Petitioners would suffer absent a stay greatly exceeds any harm imposed if a stay were granted.

107.    Petitioners are entitled to a judgment permanently staying and enjoining Respondents from enforcing the Third-Party Marketing Ban, 9 N.Y.C.R.R. §§ 123.10(g)(21) and 124.5(a); the Pricing Ban, 9 N.Y.C.R.R. § 124.1(b)(5)(ii); the Third-Party Order Ban, § 123.10(g)(23); the Third-Party All-Licensee Listing Mandate, § 124.1(b)(2); and the Third-Party Distributor Listing Mandate, § 124.1(c)(1)-(2); and annulling said Challenged Regulations because of their inconsistency with the MRTA.

**FOURTH CAUSE OF ACTION**
**(CPLR Article 78 - Annulment of the Third-Party Distributor Listing Mandate as**
**Unconstitutionally Vague Under the New York Constitution)**

108.   Petitioners repeat and reallege the allegations contained in paragraphs 1 through 107 with the same force and effect as if fully set forth here.

109.   In New York, "[a] statute, or a regulation, is unconstitutionally vague" under the New York Constitution "if it fails to provide a person of ordinary intelligence with a reasonable opportunity to know what is prohibited, and it is written in a manner that permits or encourages arbitrary or discriminatory enforcement." *Ulster Home Care, Inc. v Vacco*, 96 N.Y.2d 505, 509 (2001).

110.   Indeed, New York courts invalidate regulations that are "vague, confusing and meaningless" such that they are "arbitrary and unreasonable." *Levine v. Whalen*, 39 N.Y.2d 510, 515 (1976).

111.   Here, the Third-Party Distributor Listing Mandate, 9 N.Y.C.R.R. § 124.1(c)(1)-(2), is unconstitutionally vague under the New York Constitution.

112.   9 N.Y.C.R.R. 124.1(c)(1)-(2) does not state who would constitute "customers" under this section.  Indeed, this term could apply to licensed dispensaries, their individual customers, or both.  Further, there is no clarification provided about what is included under the umbrella term of "logistics and transportation purposes" in that regulation.  As a result, the public is left guessing what "customers" would negotiate fees with respect to unspecified "logistics and transportation" services.

113.    As described *supra*, Petitioners will suffer irreparable harm (*i.e.*, loss of goodwill and business opportunities) if enforcement of the Third-Party Distributor Listing Mandate is not stayed.

114.    The harm that Petitioners would suffer absent a stay greatly exceeds any harm imposed if a stay were granted.

115.    Petitioners are entitled to a judgment permanently staying and enjoining Respondents from enforcing the Third-Party Distributor Listing Mandate, 9 N.Y.C.R.R. § 124.1(c)(1)-(2), because it is unconstitutionally vague, in violation of the New York Constitution.

**WHEREFORE**, for the foregoing reasons, Petitioners respectfully request that this Court issue an Order:

1.    Permanently staying Respondents from taking any action to enforce or make effective the Third-Party Marketing Ban, 9 N.Y.C.R.R. §§ 123.10(g)(21) and 124.5(a); the Pricing Ban, 9 N.Y.C.R.R. § 124.1(b)(5)(ii); the Third-Party Order Ban, 9 N.Y.C.R.R. § 123.10(g)(23); the Third-Party All-Licensee Listing Mandate, 9 N.Y.C.R.R. § 124.1(b)(2); and the Third-Party Distributor Listing Mandate, 9 N.Y.C.R.R. § 124.1(c)(1)-(2); to file said Challenged Regulations with the New York Secretary of State; and/or to seek publication of the Challenged Regulations in the New York State Register;

2.    Annulling, voiding, and invalidating the Third-Party Marketing Ban, 9 N.Y.C.R.R. §§ 123.10(g)(21) and 124.5(a), and the Pricing Ban, 9 N.Y.C.R.R. § 124.1(b)(5)(ii), because they violate Article I, § 8, of the New York Constitution;

3.    Annulling, voiding, and invalidating the Third-Party Marketing Ban, 9 N.Y.C.R.R. §§ 123.10(g)(21) and 124.5(a); the Pricing Ban, 9 N.Y.C.R.R. § 124.1(b)(5)(ii); the Third-Party Order Ban, 9 N.Y.C.R.R. § 123.10(g)(23); the Third-Party All-Licensee Listing Mandate, 9 N.Y.C.R.R. § 124.1(b)(2); and the Third-Party Distributor Listing Mandate, 9 N.Y.C.R.R. § 124.1(c)(1)-(2), because they are arbitrary and capricious and inconsistent with the MRTA;

4.    Annulling, voiding, and invalidating the Third-Party Distributor Listing Mandate, 9 N.Y.C.R.R. § 124.1(c)(1)-(2), because it is unconstitutionally vague, in violation of the New York Constitution;

5.    Requiring Respondents to pay Petitioners the attorneys' fees and disbursements Petitioners will have incurred for commencing and prosecuting this action; and

6.    Granting Petitioners such other and further relief as to the Court seems proper and just.

Dated:  Buffalo, New York
       October 13, 2023

PHILLIPS LYTLE LLP

By: _Craig R. Bucki_____
      Craig R. Bucki (Bar No. 517762)
      Mitchell P. Snyder (Bar No. 704192)
Attorneys for Petitioners
*Leafly Holdings, Inc.; Stage One Cannabis,*
*LLC; and Rosanna St. John*
One Canalside
125 Main Street
Buffalo, New York  14203-2887
Telephone No. (716) 847-8400
cbucki@phillipslytle.com
msnyder@phillipslytle.com

## VERIFICATION

STATE OF WASHINGTON      )
                         )  ss.:
COUNTY OF KING           )

        CARLOS PINTO, being duly sworn, deposes and says that he is the Chief Commercial Officer and an agent of Leafly Holdings, Inc., a foreign corporation organized under the laws of the State of Delaware and a Petitioner in this proceeding; that he has read the forgoing Amended Verified Petition and knows the contents thereof; and that the same is true to his knowledge, except as to the matters therein alleged on information and belief, and that as to those matters he believes them to be true.

        The reason this Verification is made by Leafly Holdings, Inc., is because the Petitioners are united in interest and pleading together.

                              CARLOS PINTO

Sworn to before me this
13th day of October 2023.

_____
Notary Public

Doc #11466075

- 30 -

## <u>CERTIFICATE OF CONFORMITY</u>

STATE OF WASHINGTON     )
                               ) ss:
COUNTY OF KING          )

        The undersigned does hereby certify that he is an attorney at law duly admitted to practice in the State of Washington and is a resident of King County, in the State of Washington; that he is a person duly qualified to make this certificate of conformity pursuant to 299-b of the Real Property Law of the State of New York; that the Amended Verified Petition, dated October 13, 2023, was made in the manner prescribed by the laws of the State of Washington, being the State in which it was taken; and that it duly conforms with such laws and is in all respects valid and effective in such State.

Dated: October 13, 2023

_____
Patrick Moen, Esq.